# EXHIBIT
# 1

CONFIDENTIAL

## COMMERCIAL LOAN AGREEMENT
### United Bank Loan No.: ██████2194

---

**BORROWER:**

CLEARWATER INVESTMENT
**HOLDINGS, LLC**
1051 Main Street
Milton, WV 25541

**LENDER:**

UNITED BANK
500 Virginia Street East
Charleston, WV 25301

---

THIS **COMMERCIAL LOAN AGREEMENT** (this "Agreement"), is made and entered into as of the 1st day of April, 2019, by and among **CLEARWATER INVESTMENT HOLDINGS, LLC**, a Delaware limited liability company, whose address is 1051 Main Street, Milton, West Virginia 25541 ("Borrower"); **JEFFREY A. HOOPS, SR.**, whose address is 1051 Main Street, Milton, West Virginia 25541 **and PATRICIA A. HOOPS,** whose address is 1051 Main Street, Milton, West Virginia 25541 (collectively, the "Guarantors"); and **UNITED BANK**, a Virginia banking corporation, whose address is 500 Virginia Street East, Charleston, West Virginia 25301 ("Lender").

### WITNESSETH:

**WHEREAS**, Borrower has requested that Lender make a loan to Borrower to provide working capital and Lender has agreed to make a loan to Borrower in the original principal amount of Eleven Million and 00/100 Dollars ($11,000,000.00) (the "Loan") to be evidenced by the Commercial Promissory Note of Borrower (the "Note"), and certain other documents (collectively, "Loan Documents");

**WHEREAS**, the Loan will be secured by a security interest in and to that certain investment management account of Borrower, the unconditional, irrevocable, joint and several guarantees of the Guarantors, and certain other collateral as herein provided; and

**WHEREAS**, Lender is willing to make the Loan, secured as aforesaid, in accordance with the terms and provisions of this Agreement; and

**WHEREAS**, Borrower desires to obtain the Loan on such basis; and

**WHEREAS**, Guarantors are willing to guaranty the Loan on such basis.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises contained herein, the parties agree as follows:

1. **Definitions.** As used in this Agreement, unless the context requires a different meaning, the following terms shall have the meanings set forth below:

CONFIDENTIAL

**Advance.** The word "Advance" means the disbursement of Loan funds to Borrower under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Commercial Loan Agreement as the same may be amended, supplemented or modified in accordance with the terms hereof.

**Cash Flow.** The term "Cash Flow" means the net operating income derived by Borrower less dividends and distributions, but exclusive of interest expense, income tax expense, depreciation and amortization.

**Closing.** The word "Closing" means the funding of the Loan as described in Section 3.

**Closing Date.** The term "Closing Date" shall mean April 1, 2019.

**Collateral.** The word "Collateral" means that certain investment management account, known as the "Clearwater Investment Holdings LLC Investment Management Account," established and managed by Lender in the name of Borrower pursuant to the Investment Management Agreement.

**Control Agreement.** The term "Control Agreement" means the Control Agreement described in Section 4(c)(ii) hereof.

**Debt Service.** The term "Debt Service" means the sum of income tax expense and all principal and interest payments payable under any debts owed by Borrower during the accounting period in question.

**Debt Service Coverage Ratio.** The term "Debt Service Coverage Ratio" means the quotient (expressed as a ratio) obtained by dividing Cash Flow for a given accounting period by Debt Service for the same accounting period.

**Default.** The word "Default," or the word "default," means the circumstance that any "Event of Default," as defined below, shall have occurred and be uncured.

**Event of Default.** The term "Event of Default" has the meaning given in Section 9 of this Agreement.

**Governmental Authority.** The term "Governmental Authority" means the government of any nation, state, city, locality or other political subdivision thereof, and any board, bureau, agency, authority, department or other division exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any such government.

**Guarantors.** The word "Guarantors" means Jeffrey A. Hoops, Sr. and Patricia A. Hoops, jointly and severally.

**Guaranty.** The word "Guaranty" means that certain Commercial Guaranty described in Section 4(c)(iii) hereof.

CONFIDENTIAL

**Indebtedness.**   The word "Indebtedness" means the Loan, together with all other obligations, debts and liabilities of Borrower to Lender, evidenced or arising under the Loan Documents or any other source, including without limitation principal, interest, and costs and expenses for which Borrower is responsible, as well as all claims by Lender against Borrower, or any one or more of them if more than one, whether now or hereafter existing, voluntary or involuntary, due or not due, absolute or contingent, liquidated or unliquidated, arising from or related to the Loan; whether Borrower may be liable individually or jointly with others; whether Borrower may be obligated as a guarantor, surety, or otherwise; and whether such Indebtedness may be or hereafter become otherwise unenforceable. Notwithstanding the foregoing provisions, Indebtedness shall not include any loans or other agreements expressly excluded by the parties in this or any other related agreements.

**Investment Management Agreement.**   The term "Investment Management Agreement" means that certain Investment Management Agreement between Borrower, as Principal, and Lender, as Manager, governing the establishment and management of the Collateral.

**Loan.**   The word "Loan" means and includes without limitation the non-revolving loan, being Loan Number ███████2194 and financial accommodation from Lender to Borrower described or contemplated herein or on any exhibit or schedule attached to this Agreement from time to time, whether now or hereafter existing, and however evidenced.

**Loan Documents.**   The term "Loan Documents" means this Agreement, the Note, the Control Agreement, the Guaranty, and any and all other assignments, agreements, documents, instruments and certificates required to be delivered to Lender pursuant to this Agreement, including, without limitation, all of the agreements, documents and instruments listed and described in Section 4(c) hereof.

**Note.**   The word "Note" means that certain Commercial Promissory Note of even date herewith evidencing the original principal amount of Eleven Million and 00/100 Dollars ($11,000,000.00).

**Obligations.**   The word "Obligations" means and includes (i) the Borrower's obligations to repay the Loan and any other advances, indebtedness, liabilities, obligations, covenants and duties owing, arising, due or payable from Borrower to Lender under this Agreement or any of the other Loan Documents, and (ii) all interest, charges, expenses and any other sums chargeable to the Borrower by Lender under this Agreement or any of the other Loan Documents.

**Person.**   The word "Person" means any individual, firm, corporation, limited liability company, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, Governmental Authority or other entity of any kind, and shall include any successor (by merger or otherwise) of such entity.

CONFIDENTIAL

**Requirements of Law.** The term "Requirements of Law" means as to any Person, any law, treaty, rule, regulation, qualification, license, franchise or determination of any arbitrator, court or other Governmental Authority, in each case applicable to or binding upon such Person or any such Person's property or to which such Person or any of such property is subject or pertaining to any of the transactions contemplated or referred to herein.

**Security Interest.** The words "Security Interest" mean and include without limitation any type of collateral security, whether in the form of a lien, charge, mortgage, deed of trust, assignment, pledge, chattel mortgage, chattel trust, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

2.      **Representations and Warranties.**   Borrower and Guarantors represent and warrant to Lender as follows:

(a)      *Status of Borrower.*   Borrower is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware. Borrower has all requisite power and authority to own and operate its assets and to carry on its business as now conducted and to enter into this Agreement and all other Loan Documents to which it is a party.

(b)      *Status of Guarantors.*   Guarantors are persons who have the power and authority to enter into this Agreement and all other Loan Documents to which they are parties. Guarantors are not now nor have ever been the subject of any competency or guardianship proceeding.

(c)      *Authority With Respect to Agreement, Compliance With Other Instruments.*   The execution, delivery and performance of this Agreement and all other Loan Documents to which the Borrower is a party, and the consummation of the transactions contemplated hereby and thereby, (i) have been duly authorized by all necessary company action, and (ii) will not conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, the Articles of Organization or Operating Agreement of Borrower or of any law, regulation, order, writ, injunction or decree of any court or Governmental Authority applicable to Borrower or of any loan agreement, or any other agreement, contract or instrument by which the Borrower is bound.

(d)      *Binding Effect.*   Upon the execution thereof, the Loan Documents will constitute valid and legally binding obligations of the Borrower and Guarantors, as well as Borrower's or Guarantors' heirs, successors and assigns, and will be enforceable in accordance with their terms.

(e)      *No Default or Breach.*   No event has occurred and is continuing, or would result from the incurring of obligations by Borrower under this Agreement, which constitutes or, with the giving of notice or passage of time, would constitute an Event of Default.

(f)     *Title to the Collateral*.  Borrower is the owner of the Collateral, free and clear of any lien, pledge, security interest, restriction or encumbrance or other right, title or interest of any other person, firm or corporation, except for the lien granted to Lender.  Borrower will, at its sole cost and expense, defend the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein adverse to Lender.

(g)     *Place of Business or Residence*.  The address of Borrower's principal office and principal place of business is 1051 Main Street, Milton, West Virginia 25541.  The address of Guarantors for notice purposes hereunder is 1051 Main Street, Milton, West Virginia 25541.  Borrower will notify Lender in writing prior to any change in the location of its principal office or the establishment of any new, or the discontinuance of any existing, place of business.  Guarantors will notify Lender in writing prior to any change in their mailing address.

(h)     *Legal Proceedings*.  There are no actions, suits, proceedings or investigations pending or threatened against or affecting Borrower, its businesses or properties, or Guarantors, by or before any Governmental Authority, court, arbitrator or grand jury, the result of which might impair the Borrower's operations or the financial condition of Borrower, or Guarantors, or the ability of Borrower and/or Guarantors, to perform their obligations under the Loan Documents in any material respect; and neither Borrower, nor any Guarantor, is aware of any grounds or basis for any such action or claim.  Neither Borrower, nor any Guarantor, is in default with respect to any judgment, order, writ, injunction, decree, demand, law, rule or regulation of any court, arbitrator, grand jury or of any Governmental Authority, which default would adversely affect Borrower's and/or Guarantors' financial condition in any material respect.

(i)     *Consents and Approvals*.  Borrower is not required to obtain any order, consent, approval or authorization of, or required to make any declaration or filing with, any court, Governmental Authority or any other person in connection with the execution, delivery and performance of this Agreement or any of the other Loan Documents.

(j)     *Disclosure*.  No representation or warranty by Borrower contained herein or in any other Loan Document contains any untrue statement of material fact or omits to state a material fact necessary to make such representation or warranty not misleading in light of the circumstances under which it was made.  There is no fact known to the Borrower which Borrower has not disclosed to Lender that adversely affects, or insofar as Borrower can reasonably foresee, will adversely affect Borrower's and/or Guarantors' financial condition or ability to perform their Obligations in any material respect.

(k)     *Taxes*.  Borrower has filed, caused to be filed, or has properly filed for extensions for, all federal, state and local tax returns and other reports required by applicable law to be filed prior to the date hereof, have paid or caused to be paid all taxes, assessments or other governmental charges due and payable prior to the date hereof and have made adequate provision for the payment of such taxes, assessments or other charges accruing but not yet payable.  Borrower has no knowledge of any deficiency or additional assessment in a material amount in connection with any taxes, assessments or charges not provided for on their books.

CONFIDENTIAL

(l)      *Employment Benefit Plans.*   Borrower has not contributed or been obligated to contribute to a multi-employer plan as that term is defined in Section 4001 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), within the preceding five (5) years.  Borrower either (i) does not maintain any plan ("Plan") that is subject to Title IV of ERISA, or (ii) is in compliance in all material respects with all applicable provisions of ERISA relating to minimum funding requirements for each Plan.  Borrower has not incurred any liability to the Pension Benefit Guaranty Corporation ("PBGC") with respect to any Plan.

(m)      *Labor Relations.*   There is (i) no unfair labor practice complaint pending or threatened against Borrower before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under collective bargaining agreements is so pending or threatened; (ii) no strike, labor dispute, slowdown or stoppage pending or threatened against the Borrower; and (iii) no union representation question existing with respect to Borrower's employees and no union organizing activities are taking place.

(n)      *Financial Information.*  Each financial statement of Borrower supplied to Lender fairly presents in all material respects Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender.  Borrower has no material contingent obligations except as disclosed in such financial statements.

(o)      *Fiscal Year.*  Borrower's fiscal year runs from January 1 to December 31 of each calendar year.

(p)      *Commercial Purposes.*  Borrower intends to use the proceeds of the Loan solely for business or commercial related purposes.

(q)      *Accuracy of Information.*      All information heretofore or contemporaneously herewith furnished by Borrower or Guarantors to Lender for the purposes of or in connection with this Agreement or any transaction contemplated hereby is, and all information hereafter furnished by or on behalf of Borrower or Guarantors to Lender will be true and accurate in every material respect on the date as of which such information is or will be dated or certified; and none of such information is incomplete by omitting to state any material fact necessary to make such information not misleading.

(r)      *Lender's Reliance.*  Borrower and Guarantors understand and agree that Lender, without independent investigation, is relying upon the above representations and warranties in making the above-referenced Loan to Borrower.

(s)      *Survival of Representations and Warranties.*  Borrower and Guarantors further agree that the foregoing representations and warranties shall be continuing in nature and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

3.     The Loan.

(a)     *Use of Proceeds*.  Borrower shall use proceeds of the Loan as working capital and to pay the expenses associated with obtaining the Loan.

(b)     *Disbursement of Loan Proceeds*.  The proceeds of the Loan will be disbursed or made available for disbursement by Lender on the Closing Date upon the satisfaction of all closing requirements and conditions provided in Section 4 of this Agreement.

(c)     *Repayment*.  Commencing on May 1, 2019, and continuing on the same day of each month thereafter, Borrower shall make twenty-three (23) consecutive monthly installment payments of accrued interest only, in arrears.   A final payment of the total outstanding balance of principal, accrued interest, late charges, and any other fees and costs shall mature and be due and payable, in full, on April 1, 2021 (the "Maturity Date").

(d)     *Interest Rate*.  The interest rate of this Loan shall be subject to change monthly based on changes in an independent index which is the highest 30 day LIBOR (the "Index") plus 1.50% per annum.  Notwithstanding the foregoing, the interest rate of this Loan shall never be less than one and one-half percent (1.50%) per annum.

(i)     As used herein, LIBOR shall mean the rate obtained by dividing: (1) the actual per annum rate of interest for deposits in U.S. dollars for the related LIBOR Interest Period (as hereinafter defined) based upon information which appears on page LIBOR01, captioned British Bankers Assoc. Interest Settlement Rates, of the Reuters America Network, a service of Reuters America Inc. (or such other page that may replace that page on that service for the purpose of displaying London interbank offered rates; or, if such service ceases to be available or ceases to be used by Lender, such other reasonably comparable money rate service as Lender may select) or upon information obtained from any other reasonable procedure, as of two Banking Days (as hereinafter defined) prior to the first day of a LIBOR Interest Period; by (2) an amount equal to one minus the stated maximum rate (expressed as a decimal), if any, of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special or other reserves) that is specified on the first day of each LIBOR Interest Period by the Board of Governors of the Federal Reserve System (the "System") or any successor agency thereto for determining the maximum reserve requirement with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D of such Board) maintained by a member bank of such System, or any other regulations of any governmental authority having jurisdiction with respect thereto as conclusively determined by Lender.  Subject to any maximum or minimum interest rate limitation specified herein or by applicable law, any variable rate of interest on the obligation evidenced hereby shall change automatically without notice to the Borrower on the first day of each LIBOR Interest Period.  Lender shall obtain the Index from the "Money Rates" section of the Wall Street Journal.  If the Index becomes

CONFIDENTIAL

unavailable during the term of this loan, Lender may designate a substitute index after notice to Borrower; provided that in such event, the Margin (as defined below) shall be adjusted in order to make the interest rate comparable to the interest rate under the prior Index. Lender will tell Borrower the current Index rate upon Borrower's request. Borrower understands that Lender may make loans based on other rates as well.

(ii)     Determination of Index.  The Note may express an initial interest rate and an initial index value to five (5) places to the right of the decimal point. This expression is done solely for convenience. The reference sources for the index used by Lender, as stated in the Note, may actually quote the index on any given day to as many as five (5) places to the right of the decimal point. Therefore, the actual index value used to calculate the interest rate on and the amount of interest due under this Note will be to five (5) places to the right of the decimal point.

(iii)    Additional LIBOR Provisions.  As used herein, LIBOR Interest Period shall mean one month provided that: (1) if any LIBOR Interest Period would otherwise expire on a day which is not a Banking Day, the LIBOR Interest Period shall be extended to the next succeeding Banking Day (provided, however, that if such next succeeding Banking Day occurs in the following calendar month, then the LIBOR Interest Period shall expire on the immediately preceding Banking Day).

In the event that the Lender reasonably determines that by reason of (1) any change arising after the date of this Note affecting the interbank eurocurrency market or affecting the position of the Lender with respect to such market, adequate and fair means do not exist for ascertaining the applicable interest rates by reference to which the LIBOR then being determined is to be fixed, (2) any change arising after the date of this Note in any applicable law or governmental rule, regulation or order (or any interpretation thereof, including the introduction of any new law or governmental rule, regulation or order), or (3) any other circumstance affecting the Lender or the interbank market (such as, but not limited to, official reserve requirements required by Regulation D of the Board of Governors of the Federal Reserve System) the LIBOR plus the applicable spread shall not represent the effective pricing to the Lender of accruing interest hereunder based on the LIBOR, then, and in any such event, the accruing of interest hereunder based upon the LIBOR shall be suspended until the Lender shall notify Borrower that the circumstances causing such suspension no longer exist. In such case, beginning on the date of such suspension, interest shall accrue hereunder at a variable interest rate per annum, which shall change in the manner set forth below equal to one percentage point less than the Prime Commercial Rate (as hereinafter defined).

In the event that on any date the Lender shall have reasonably determined that accruing interest hereunder based upon the LIBOR has become unlawful by

CONFIDENTIAL

compliance by the Lender in good faith with any law, governmental rule, regulation or order, then, and in any such event, the Lender shall promptly give notice thereof to the Borrower. In such case, accruing interest hereunder based on the LIBOR shall be terminated and the Borrower shall, at the earlier of the end of each LIBOR Interest Period then in effect or when required by law, repay the advances based upon the LIBOR, together with interest accrued thereon. In such case, when required by law, interest shall accrue hereunder at a variable rate of interest per annum, which shall change in the manner set forth below, equal to **one** percentage point less than the Prime Commercial Rate.

As used herein, Prime Commercial Rate shall mean the rate established by the Lender from time to time based on its consideration of economic, money market, business and competitive factors, and is not necessarily the Lender's most favored rate. Subject to any maximum or minimum interest rate limitation specified herein or by applicable law, any variable rate of interest on the obligation evidenced hereby based upon the Prime Commercial Rate shall change automatically without notice to the Borrower immediately with each change in the Prime Commercial Rate. If during any period of time while interest is accruing hereunder based upon the Prime Commercial Rate, the obligation evidenced by this Note is not paid at maturity, whether maturity occurs by lapse of time, demand acceleration or otherwise, the unpaid principal balance and any unpaid interest thereon shall, thereafter until paid, bear interest at a rate equal to **two** percentage points in excess of the rate indicated in the immediately preceding two paragraphs.

If, due to (1) the introduction of or any change in or in the interpretation of any law or regulation, (2) the compliance with any guideline or request from any central bank or other public authority (whether or not having the force of law), or (3) the failure of the Borrower to repay any advance when required by the terms of this Note, there shall be any loss or increase in the cost to the Lender of accruing interest hereunder based upon the LIBOR, then the Borrower agrees that the Borrower shall, from time to time, upon demand by the Lender, pay to the Lender additional amounts sufficient to compensate the Lender for such loss or increased cost. A certificate as to the amount of such loss or increased cost, submitted to Borrower by Lender, shall be conclusive evidence, absent manifest error, of the correctness of such amount.

Notwithstanding that the section below entitled "Prepayment," during any period of time while interest is accruing hereunder based upon the LIBOR, Borrower may not prepay any portion of the outstanding principal balance prior to the expiration of the then current LIBOR Interest Period.

**NOTICE**: Under no circumstances will the interest rate on the Loan be more than the maximum rate allowed by applicable law. The rate is not necessarily the lowest rate charged by Lender on its loans.

(e)    *Due Date*.  All scheduled payments of the Loan shall be due and payable on the first (1st) day of the month.  If the due date of any payment under this Loan shall be a day that is not a day when banking business is conducted by Lender (a "Banking Day"), the due date shall be extended to the next succeeding Banking Day; provided, however, that if such next succeeding Banking Day occurs in the following calendar month, then the due date shall be the immediately preceding Banking Day.

(f)    *Late Charges*.  In the event any payment, excluding any balloon payment, is not made within ten (10) days from the date on which the payment was due, the Lender shall be entitled to impose a late charge equal to five percent (5.00%) of the amount of such late payment with a minimum charge of Twenty Five and 00/100 Dollars ($25.00).

(g)    Prepayment.  There shall be no prepayment premium for the early repayment or payoff of the Note.

(h)    Post Maturity Interest.  At Lender's option, post maturity interest will accrue (i) at the legally maximum interest rate per year; or (ii) at the same rate as interest accrued prior to maturity, as described in Paragraph 3(e), on the balance of the loan not paid at maturity. This subsection includes maturity by acceleration due to noncompliance with any term or condition as indicated in this Agreement, or any other Loan Document.

(i)    *Default Rate of Interest*.  Upon the occurrence of an Event of Default under this Agreement, or any default under the Note or any of the Loan Documents, the interest rate applicable to the Loan, for a period beginning upon the occurrence of such default and ending upon the curing of such default, shall increase to the interest rate described in Paragraph 3(d) above plus five percent (5.00%) per annum for so long as the default continues (the "Default Interest Rate").  The Default Interest Rate shall apply to the outstanding principal balance of the Loan.  Upon the curing of the default, the interest rate on the Loan shall revert to the initially agreed-upon interest rate effective on the date that the default is cured.

4.    **Conditions of Closing**.  Lender's obligation to make the Loan shall be subject to the satisfaction as determined by, or waived by, Lender of the following conditions on or before the Closing Date:

(a)    *Compliance with this Agreement*.  The performance by Borrower prior to or at the Closing of all its agreements theretofore to be performed under this Agreement.

(b)    *Representations and Warranties*.  The accuracy of Borrower's and Guarantors' representations and warranties contained in Section 2 at and as of the Closing Date.

(c)    *Documents Required*.  Borrower shall deliver or cause to be delivered to Lender at Closing the following documents, all executed by the proper parties and in form and substance satisfactory to Lender on or before the date indicated:

(i)    The Note, executed by Borrower, evidencing Borrower's obligation to repay the Loan;

CONFIDENTIAL

(ii)     The Control Agreement, executed by Borrower, granting a security interest in the investment management account described therein;

(iii)     The Guaranty, executed by the Guarantors;

(iv)     Evidence of all necessary approvals of the Loan and Loan Documents by Borrower;

(v)     A copy of the organizational documents and certificate of good standing for Borrower; and

(vi)     A UCC-1 lien search from the Secretary of State of the State of Delaware.

(d)     *Certain Events*.  At the time of the Closing:

(i)     No Event of Default (as hereinafter defined) shall have occurred and be continuing, and no event or condition shall have occurred and be continuing that, with the giving of notice or passage of time or both, would be an Event of Default;

(ii)     All representations and warranties of Borrower and Guarantors in this Agreement or in any other document or certificate delivered to Lender by or on behalf of Borrower or Guarantors prior to or at the Closing in connection with the transactions contemplated hereby shall be true and correct on the date hereof and at and as of the Closing Date after giving effect to the transactions contemplated by this Agreement.

(e)     *Payment of Fees*.  Borrower shall have paid to Lender an origination fee of One Thousand Five Hundred and 00/100 Dollars ($1,500.00).  Additionally, Borrower shall have paid or satisfactorily provided for all reasonable expenses incurred in connection with the Loan, including, but not limited to, all Lender fees, costs of searches, recording costs, document preparation fees, and the reasonable fees and expenses of the Lender's counsel.

(f)     *Legal Matters*.  As of the Closing Date, all legal matters incidental thereto shall be reasonably satisfactory to Lender's counsel.

(g)     *Waiver of Conditions Precedent*.  If Lender makes any Advance of the Loan prior to the fulfillment of any of the conditions set forth in this Section 4, the making of such Advance shall constitute only an extension of time for the fulfillment of such condition and not a waiver thereof, and Borrower shall thereafter use their best efforts to fulfill each such condition promptly.

5.    **Affirmative Loan Covenants**.  Borrower covenants and agrees that so long as this Agreement is in effect and so long thereafter as any obligations relating to the Loan remain outstanding, Borrower, and to the extent context requires, Borrower and Guarantors, shall:

(a)    Furnish, or cause to be furnished, to Lender: (i) not later than one hundred twenty (120) days after the end of each year, complete copies (with all accompanying exhibits and schedules) of all federal income tax returns of Borrower and Guarantors; (ii) not later than one hundred twenty (120) days after the end of each year, annual year-end financial statements of Borrower; (iii) not later than one hundred twenty (120) days after the end of each year, personal financial statements of Guarantors; and (iv) such other financial information as Lender reasonably requests.

(b)    Indemnify, defend and hold harmless the Lender from and against any loss, cost, expense, liability and claims arising from actual or alleged noncompliance with governmental regulation.  Borrower will promptly furnish the Lender with a copy of any notice, claim or demand by any person or governmental agency or office to the effect that Borrower has failed to comply with any applicable law.

(c)    Take all necessary steps to preserve its entity existence, remain in good standing with the Secretary of State of the State of Delaware, and comply with all present and future Requirements of Law applicable to it or its business.

(d)    Notify Lender immediately in writing if it becomes aware of the occurrence of any Event of Default or of any fact, condition or event that with the giving of notice or passage of time or both, could become an Event of Default, or of the failure of Borrower to observe any of its undertakings hereunder.

(e)    Notify Lender immediately and in writing of any litigation, claim or cause of action which has been asserted against Borrower which, if unfavorably resolved, would materially adversely affect Borrower's ability to perform its obligations under the Loan Documents.

(f)    Maintain Borrower's books and records in accordance with Borrower's normal basis of accounting, applied on a consistent basis.  Borrower will further permit Lender to examine and audit Borrower's books, records and business operations, at reasonable times, including without limitation within a reasonable time following closing of the Loan, and on a semi-annual basis thereafter.

(g)    Pay and discharge, or cause to be paid and discharged, when due, all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits; *provided however*, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as the legality of the same shall be contested in good faith by appropriate proceedings and Borrower shall have established on its books adequate reserves with

CONFIDENTIAL

respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with generally accepted accounting practices. Borrower, upon reasonable demand of Lender, will furnish to Lender evidence of payment of the assessments, taxes, charges, levies, liens and claims and will authorize the appropriate governmental official to deliver to Lender at any time a written statement of any assessments, taxes, charges, levies, liens and claims against Borrower's properties, income or profits.

(h)     Make, execute and deliver to Lender such documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loan and to perfect all Security Interests.

(i)     At all times, both before and after repayment of the Indebtedness, at its sole cost and expense, defend, indemnify, exonerate and save harmless Lender and all those claiming by, through or under Lender (each, an "Indemnified Party") from and against any and all claims, expense, damage, loss or liability incurred by an Indemnified Party including, without limitation, reasonable attorneys' and experts' fees and disbursements, which may at any time (including, without limitation, before or after discharge or foreclosure of any of the Loan Documents) be imposed upon, incurred by or asserted or awarded against Indemnified Party and arising from or out of:

(i)     any liability for damage to person or property arising out of any violation of this Agreement or any of the Loan Documents;

(ii)     any breach of any representation or warranty of Borrower contained in this Agreement or any of the Loan Documents or in any certificate or other writing submitted to the Lender in connection therewith; or

(iii)     any act, omission, negligence or conduct (a) occurring on or related to any portion of the operations or business interest of Borrower, or (b) arising or claimed to have arisen, out of any act, omission, negligence or conduct of Borrower or any representative, lender, agent, or contractor of Borrower, occupant or invitee thereof, or (c) which otherwise is in any way related to Borrower's operations.  Notwithstanding the foregoing, an Indemnified Party shall not be entitled to indemnification in respect of claims arising from acts of its own negligence, gross negligence or willful misconduct to the extent that such negligence, gross negligence or willful misconduct is determined by the final judgment of a court of competent jurisdiction, not subject to further appeal, in proceedings to which such Indemnified Party is a proper party.

(j)     Notify Lender in writing within ten (10) days of any change of Borrower's principal office or principal place of business address.

(k)     Provide Lender with access to and/or copies of all financial records within five (5) days following a written request from Lender.

(l)     Establish and maintain an operating deposit account with Lender.

(m)     Maintain a Debt Service Coverage Ratio of 1.5 to 1, to be tested annually beginning December 31, 2019.

(n)     Maintain a Loan to Collateral Ratio of eighty percent (80.0%).

(o)     Cause the Investment Management Agreement to remain in effect for the term of the Loan.

The obligations under this section shall constitute Indebtedness for all purpose of this Agreement or any of the Loan Documents.

6.     **Negative Covenants.** Borrower covenants and agrees that so long as this Loan Agreement is in effect and so long thereafter as any obligations relating to the Loan remain outstanding, Borrower shall not, without the prior written consent of Lender:

(a)     Change its name, liquidate or dissolve, or enter into any merger or consolidation, or have any of its ownership interests transferred. The prior written consent of Lender shall not be required for sales, transfers or exchanges to current owners of Borrower (or to their children, heirs or trusts for the benefit of their children or heirs), on the condition that two or more of the current owners of Borrower shall retain at least fifty-one percent (51%) of the ownership interests of such entity at all times.

(b)     Make or permit any change in the ownership or management structure of Borrower, or modify or amend its Operating Agreement. The prior written consent of Lender shall not be required for sales, transfers or exchanges to current owners of Borrower (or to their children, heirs or trusts for the benefit of their children or heirs), on the condition that two or more of the current owners of Borrower shall retain at least fifty-one percent (51%) of the ownership interests of such entity at all times.

(c)     Declare or pay distributions, or make loans or advances, to Borrower's members or increase the present compensation of its manager(s), at any time that Borrower is in default or not in compliance with all terms, provisions and covenants of this Agreement or any of the Loan Documents.

(d)     Furnish Lender any certificate or other document containing any untrue statement of material fact or omitting a material fact necessary to make it not misleading in light of the circumstances under which it was furnished.

(e)     Pledge, sell, further encumber or otherwise dispose of the Collateral or create, or allow to be created, any lien or charge upon the Collateral, unless in compliance with the terms of this Agreement.

(f)     Create, incur, guarantee, endorse, or assume any indebtedness, except for any other indebtedness with Lender or any debt incurred in the ordinary course of business.

CONFIDENTIAL

7.      **Advances to Perform Covenants.** Borrower agrees that Lender shall have the right, without any obligation whatsoever, to make advances on behalf of Borrower for the purpose of performing any covenant of the Borrower hereunder, and that any amounts so advanced by Lender will become part of the Loan and bear interest from the date so advanced by Lender at the rate provided for in the Note and be entitled to the benefits of this Agreement and to the liens, security interests, and other benefits of the Loan Documents.

8.      **Further Assurances.** Borrower will from time to time execute such further instruments and do such further acts and things as Lender may reasonably require by way of further assurance to Lender of the matters and things in this Agreement provided for or intended so to be.

9.      **Events of Default.** Any one or more of the following shall constitute an "Event of Default" under this Agreement:

(a)      *Default on Payment of the Indebtedness.* Failure of Borrower to make any payment within ten (10) days of when due on the Indebtedness.

(b)      *Other Defaults.* Failure of Borrower to keep any written promise Borrower has made to Lender, failure of Borrower to comply with or to perform when due any other term, obligation, covenant or condition contained in this Agreement or any of the Loan Documents, or failure of Borrower to comply with or to perform any other material term, obligation, covenant or condition contained in any other agreement between Lender and Borrower, or the occurrence of any Event of Default under any such agreement or related document which remains for a period of thirty (30) days (or such other period as agreed to by Borrower and Lender as reasonable to cure said default) following written notice provided to Borrower.

(c)      *Cross Default.* Should Borrower and/or any of its affiliates default under any loan, extension of credit, security agreement, or other debt owing to Lender, if such default is not cured within any applicable cure period.

(d)      *Default in Favor of Third Parties.* Should Borrower default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person, if, in Lender's reasonable discretion, such default results in an adverse change in the financial condition, creditworthiness, or business prospects of Borrower in any material respect, and such default is not cured within thirty (30) days.

(e)      *False Statements.* Any warranty, representation or statement made or furnished to Lender by or on behalf of or by Borrower under this Agreement or any Loan Documents is false or misleading in any material respect either now or at the time made or furnished, or becomes false or misleading at any time thereafter.

(f)     *Defective Collateralization*.   The Control Agreement ceases to be in full force and effect, including failure to create a valid and perfected Security Interest, at any time and for any reason.

(g)     *Dissolution or Insolvency*.   The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower that shall remain undismissed for a period of sixty (60) days.

(h)     *Encumbrances on the Collateral*.   Should any claim, encumbrance, or lien be superior to the lien of Lender to be granted in the Control Agreement, if such claim, encumbrance, or lien is not discharged or bonded off within thirty (30) days of the creation thereof.

(i)     *Creditor or Forfeiture Proceedings*.   Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against Borrower or the Collateral or any other collateral securing the Indebtedness, including, but not limited to, a garnishment, attachment, or levy of any of Borrower's property with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in a reasonable amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for dispute.

(j)     *Change in Beneficial Interests*.   Should, in violation of the terms of this Agreement, any of the membership interests or other beneficial interest in Borrower be sold or transferred, including the creation of a lien or encumbrance, without Lender's prior written consent.

(k)     *Adverse Change*.   An adverse change occurs in Borrower's financial condition in any material respect.

(l)     *Organization*.   Any action by Borrower's members to wind-up and dissolve the affairs of Borrower or any action by Borrower to merge or consolidate Borrower with a third party.

(m)     *Chronic Events of Default*.   The occurrence, in any consecutive twelve (12) month period, of three (3) Events of Default, whether cured within the applicable cure period or not.

(n)     *Events Affecting Guarantors*.   Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness.  This Event of Default shall also apply if any Guarantor dies or becomes incompetent; *provided, however*, in such event, so long as the estate or any guardian of said Guarantor provides, within thirty (30) days of death or incapacity,

satisfactory information to Lender that demonstrates that the estate of said Guarantor or said Guarantor himself will remain in sufficient financial condition to provide Lender with requisite security, as determined by Lender in its sole discretion, of the Indebtedness. Lender shall permit said Guarantor's estate (or said Guarantor himself, as the case may be) to assume unconditionally the obligations arising under the Commercial Guaranty in a manner satisfactory to Lender, and, in doing so, cure the Event of Default.

10.      **Effect of an Event of Default.**  If any Event of Default shall occur, except where otherwise provided in this Agreement or the Loan Documents, all commitments and obligations of Lender under this Agreement or the Loan Documents immediately will terminate and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional.  In addition, Lender shall have all the rights and remedies provided in the Loan Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently.  Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower shall not affect Lender's right to declare a default and to exercise its rights and remedies.

11.      **Remedies Upon Default.**  If an Event of Default occurs under this Agreement, which remains for a period of ten (10) days for a monetary default or a period of thirty (30) days for a non-monetary default (or such other period as agreed to by Borrower and Lender) following written notice provided to Borrower (except as to a monetary default in Paragraph 9(a) for which no notice is required), at any time thereafter, Lender shall have all the rights of a secured party at law, in equity, and all rights as set forth in the Loan Documents. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

(a)      *Accelerate Indebtedness.*  Lender may declare the entire Indebtedness immediately due and payable, without notice.

(b)      *Assemble Collateral.*  Lender may require Borrower to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender.  Lender also shall have full power to enter upon the property of Borrower to take possession of and remove the Collateral or to remain upon the property and operate the Collateral and other property used in the Borrower's business and affairs.  If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower agrees Lender may take or operate such other goods, provided that Lender makes reasonable efforts to return them to Borrower after repossession.

(c)      *Sell the Collateral.*  Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in its own name or that of Borrower. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will

CONFIDENTIAL

give Borrower and other parties entitled to reasonable notice of the time and place of any public sale and reasonable notice of the time after which any private sale or any other intended disposition of the Collateral is to be made. The requirements of reasonable notice, to the extent such requirements apply to Borrower and Guarantors, shall be met if such notice is given at least ten (10) days before the time of the sale or disposition in accordance with Section 13(d) of this Agreement. All expenses relating to the disposition of the Collateral and any collateral under any Loan Documents, including without limitation, the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note's rate from date of expenditure until repaid. Lender has no obligation to clean up or otherwise prepare the Collateral for sale. Lender shall sell the Collateral without giving any warranties as to the Collateral. Lender shall specifically disclaim any warranties of title or the like.

(d)     *Appoint Receiver.* Lender shall have the following rights and remedies regarding the appointment of a receiver: (a) Lender may have a receiver appointed as a matter of right, (b) the receiver may be an employee of Lender and may serve without bond, and (c) all fees of the receiver and his or her attorney shall become part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note's rate from date of expenditure until repaid.

(e)     *Collect Revenues, Apply Accounts.* Lender, either itself or through a receiver, may collect the Borrower's account receivable and/or the payments, rents, income, and revenues from the Collateral. Lender may at any time in its discretion transfer any Collateral into its own name or that of its nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, chooses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Borrower, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

(f)     *Setoff.* Lender may charge or setoff all Indebtedness against any and all Collateral in its possession.

(g)     *Obtain Deficiency.* If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower, the Guarantors, or any combination thereof for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower, Guarantors, or any combination thereof, shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

(h)    *Other Rights and Remedies*.   Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code of West Virginia, as may be amended from time to time.  In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

(i)    *Cumulative Remedies*.   All of Lender's rights and remedies, whether evidenced by this Agreement or the Loan Documents or by any other writing, shall be cumulative and may be exercised singularly or concurrently.  Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under this Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare a default and to exercise its remedies.

**12.    JURY TRIAL WAIVER.    BORROWER AND GUARANTORS ACKNOWLEDGE THAT, AS TO ANY AND ALL DISPUTES THAT MAY ARISE WITH RESPECT TO THE COVENANTS AND CONDITIONS OF THIS AGREEMENT, THE COMMERCIAL NATURE OF THE LOAN WOULD MAKE ANY SUCH DISPUTE UNSUITABLE FOR TRIAL BY JURY.    ACCORDINGLY, BORROWER, GUARANTORS AND LENDER BY THEIR ACCEPTANCE OF THE AGREEMENT HEREBY WAIVE THE RIGHT TO TRIAL BY JURY AS TO ANY AND ALL DISPUTES THAT MAY ARISE RELATING TO THIS LOAN AGREEMENT, THE NOTE, OR THE LOAN DOCUMENTS.**

**13.    Miscellaneous.**

(a)    *Applicable Law*.   This Agreement has been delivered to Lender and accepted by Lender in the State of West Virginia  If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the Circuit Court of Kanawha County, West Virginia.  This Agreement shall be governed by and construed in accordance with the laws of the State of West Virginia without regard to the principles of conflicts of law adhered to therein.

(b)    *Caption Headings*.   Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

(c)    *Entire Agreement; Amendments*.   This Agreement, together with any Loan Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

(d)    *Notices*.   All notices, requests, demands, directions and other communications (collectively all "Notices") required to be given under this Agreement shall be given in writing, and shall be sent by electronic mail with additional notice being sent by either facsimile, or United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown above. Such notice shall be effective when actually sent by electronic mail.  The sender of such notice shall retain a copy of the transmission which

CONFIDENTIAL

shall serve as evidence of receipt by the party receiving such. Any party may change its address for notices under this Loan Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower will keep Lender informed at all times of Borrower's current address.

(e)     *No Waiver.*  Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any obligations of Borrower or of any Grantor as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent in subsequent instances where such consent is required, and in all cases such consent may be granted or withheld in the sole discretion of Lender.

(f)     *Reasonable Costs and Expenses.*  Borrower agrees to pay upon demand all of Lender's reasonable expenses, including without limitation reasonable attorneys' fees, incurred in connection with the preparation, execution, enforcement, modification and collection of this Agreement or in connection with the Loan made pursuant to this Agreement. Lender may pay someone else to help collect the Loan and to enforce this Agreement and Borrower will pay that amount, including, but not limited to, Lender's attorneys' fees and Lender's legal expenses (subject to any limits under applicable law), whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also will pay any court costs, in addition to all other sums provided by law.

(g)     *Severability.*  If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

(h)     *Successors and Assigns.*  All covenants and agreements contained by or on behalf of Borrower shall bind its successors and assigns and shall inure to the benefit of Lender, its successors and assigns. Borrower shall not, however, have the right to assign its rights under this Agreement or any interest therein, without the prior written consent of Lender.

(i)     *Survival.*  . All warranties, representations, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement shall be considered to have been relied upon by Lender and will

CONFIDENTIAL

survive the making of the Loans and delivery to Lender of the Loan Documents, regardless of any investigation made by Lender or on Lender's behalf.

        (j)     *Time Is of the Essence*   Time is of the essence in the performance of this Agreement.

        (k)     *Waivers, Modifications and Amendments*   Lender shall not be deemed to have waived any provision hereof except by instrument in writing duly signed by an authorized officer of Lender, and no delay or omission of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy, whether of the same or of a different nature, on any future occasion.  This Agreement may be modified or amended only by an instrument in writing signed by the party against whom enforcement is sought.

    **IN WITNESS WHEREOF**, the parties have caused this Commercial Loan Agreement to be duly executed as of the date first hereinabove written.

[*Signatures Begin on Following Page*]

CONFIDENTIAL

## COMMERCIAL LOAN AGREEMENT
(Signature Pages)

BORROWER:

**CLEARWATER INVESTMENT HOLDINGS,**
LLC, a Delaware limited liability company


By: _____
Patricia A. Hoops, Manager


GUARANTORS:

_____
JEFFREY A. HOOPS, SR.

_____
PATRICIA A. HOOPS

CONFIDENTIAL

## COMMERCIAL LOAN AGREEMENT
(Signature Pages)

**LENDER:**

                                     **UNITED BANK**, a Virginia banking corporation

By: _____
             James David Mills, Vice President